IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| THE GABELLI GLOBAL MULTIMEDIA TRUST INC., | * | |
| Plaintiff, | * | Civil No. RDB 10-0557 |
| v. | * | |
| WESTERN INVESTMENT LLC, WESTERN INVESTMENT HEDGED, PARTNERS LP, WESTERN INVESTMENT TOTAL RETURN PARTNERS LP, WESTERN INVESTMETN TOTAL RETURN FUND LTD., AND ARTHUR LIPSON, | * * * * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Plaintiff, the Gabelli Global Multimedia Trust, Inc., ("GGMT") has filed this lawsuit alleging violations of sections 12(d)(1)(A)(i) and 48(a) of the Investment Company Act of 1940 (the "ICA" or "Act") (15 U.S.C. §§ 80a-12(d)(1)(A)(i) and 80a-48(a)).  Plaintiff contends that Defendants Western Investment LLC, Western Investment Hedged Partners LP, Western Investment Total Return Partners LP, Western Investment Total Return Fund Ltd., and Arthur D. Lipson have breached the anti-pyramiding provision of the ICA by illegally acquiring GGMT's voting stock and threatening to use that voting power in a proxy contest at GGMT's next shareholders' meeting.  Defendants have moved to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted, Fed. R. Civ. P. 12(b)(6), lack of personal jurisdiction, Fed. R. Civ. P. 12(b)(2), and improper venue, Fed. R. Civ. P. 12(b)(3).  The issues

have been fully briefed and a hearing was held on March 18, 2010.  The parties' arguments have focused on the threshold issue of whether GGMT has standing to assert private causes of action under sections 12(d)(1)(A)(i) and 48(a) of the ICA.  For the reasons stated below, this Court finds that private causes of action may not be implied under these provisions of the Act, and Defendants' Motion to Dismiss (Paper No. 6) is accordingly GRANTED.

## BACKGROUND

The Gabelli Global Multimedia Trust, Inc., ("Plaintiff" or "GGMT") is a closed-end fund that is organized under the laws of Maryland and registered under the Investment Company Act. GGMT is located in Rye, New York, and its stock is traded on the New York Stock Exchange. (Compl. ¶ 13.)  Defendants Western Investment Hedged Partners LP ("Hedged Partners"), Western Investment Total Return Partners LP ("Total Return Partners"), and Western Investment Total Return Fund Ltd. ("Total Return Fund") (together, "Western Funds"), are investment companies organized under the laws of Delaware and the Cayman Islands.  (Compl. ¶¶ 14-16.) Defendant Western Investment LLC, a limited liability company organized under the laws of Delaware, has sole voting and investment power over the security holdings of the Western Funds.  Western Investment LLC is in turn solely controlled by Defendant Arthur D. Lipson ("Lipson"), a resident of Utah, who manages its voting and investment decisions.  (*Id.* ¶¶ 18-19.)

Lipson allegedly pursues an activist arbitrage investment strategy, whereby he seeks to profit from companies trading at a discount to their perceived "fair" value.[1]  Through his Western Funds, Lipson acquires stock in targeted companies and then takes steps to influence the companies' management and investment policies in order to close, and thereby profit from, the discount in their stock price.  (*Id.* ¶ 27.)

---

[1] A closed-end fund like GGMT trades at a discount when its stock price is below the net asset value of the fund's assets.

Under his arbitrage investment strategy, Lipson allegedly begins by acquiring a foothold stake in a target company. He structures his stock acquisitions so that each of the Western Funds purchases up to—but no more than—three percent of the outstanding shares of a target investment company. The strategy is allegedly designed to circumvent the anti-pyramiding provision of the ICA, § 12(d)(1)(A)(i), which prohibits any investment company from owning more than three percent of another investment company. (*Id.* ¶ 2.) However, Plaintiff claims that despite Defendants' carefully choreographed strategy, they still contravene this provision when the Western funds' aggregate ownership exceeds the three percent limit set forth in § 12(d)(1)(A)(i). (*Id.* ¶ 24.)

Lipson is alleged to have unlawfully acquired a foothold stake in GGMT. Defendants began purchasing stock in GGMT in late November 2009, and by mid-December they had already acquired over 3% of GGMT's voting stock. (*Id.* ¶ 28.) On December 14, 2009, Western Investment LLC informed GGMT that Defendants proposed to nominate Lipson and Gregory R. Dube for election as directors of GGMT at its 2010 shareholders' meeting. (*Id.* ¶ 28.) In their Schedule 13D, filed on February 26, 2010, Defendants revealed that they had acquired more than 5% of GGMT and wanted GGMT's management "to cause [GGMT's] discount to net asset value to be eliminated or substantially reduced." (*Id.* ¶ 30.)

On March 5, 2010, GGMT filed the present Complaint seeking declaratory and injunctive relief against Defendants for violations of §§ 12(d)(1)(A)(i) and 48(a) of the ICA. On that same day, GGMT also filed a Motion for Preliminary Injunction (Paper No. 2) and a Motion To Expedite Discovery (Paper No. 3).

On March 10, 2010, Defendants moved to dismiss GGMT's Complaint under Fed. R. Civ. P. 12(b)(6) on the basis that no private rights of action exist under §§ 12(d)(1)(A)(i) and

48(a).  In addition, Defendants contend that dismissal is warranted under Fed. R. Civ. P. 12(b)(2) and 12(b)(3) for lack of personal jurisdiction and improper venue.

At the hearing conducted on March 18, 2010, the parties debated whether a private cause of action exists under §§ 12(d)(1)(A)(i) and 48(a) of the ICA—a threshold issue concerning standing.  As the parties concede, this Court may consider the merits of GGMT's suit only if it first finds that a private cause of action may be considered under one of these statutory provisions.

## STANDARD OF REVIEW

Under Rule 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a).  Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted, *see* Fed. R. Civ. P. 12(b)(6), and therefore a Rule 12(b)(6) motion tests the legal sufficiency of a complaint.

A complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action" in order to survive a motion to dismiss. *Id.* at 555.  Well-pleaded factual allegations contained in the complaint are assumed to be true "even if [they are] doubtful in fact," but legal conclusions are not entitled to judicial deference. *Id.*

To survive a Rule 12(b)(6) motion, the legal framework of the complaint must be supported by factual allegations that "raise a right to relief above the speculative level." *Id.*  On a spectrum, the Supreme Court has recently explained that the plausibility standard requires that

the pleader show more than a sheer possibility of success, although it does not impose a "probability requirement." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* At bottom, the court must "draw on its judicial experience and common sense" to determine whether the pleader has stated a plausible claim for relief. *Id.*

## ANALYSIS

### I.     The Investment Company Act of 1940

The Investment Company Act of 1940 (the "ICA" or "Act") establishes a scheme that regulates investment companies that provide mutual fund services. Mutual funds are entities that raise money from investors and invest the proceeds in securities. *See Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 93 (1991). The Act was adopted due to Congress's concerns about "the potential for abuse inherent in the structure of investment companies" and the need to protect investors in these companies. *Burks v. Lasker*, 441 U.S. 471, 480 (1979). Its promulgation in 1940 came on the heels of a four-year study conducted by the SEC on the investment company industry, which "depicted fantastic abuse of trust by investment company management and wholesale victimizing of security holders." *United States v. Deutsch*, 451 F.2d 98, 108 (2d Cir. 1971); *see also Harriman v. E.I. du Pont De Nemours & Co.*, 411 F. Supp. 133, 159 (D. Del. 1975) (explaining that the ICA was "designed to protect shareholders of investment companies from a variety of sharp practices that had become widespread during the 1930's"); *Option Advisory Serv., Inc. v. SEC*, 668 F.2d 120, 121 (2d Cir. 1981) (per curiam) (stating that "[t]he purpose of the Act is to remedy certain abusive practices in the management of investment companies, for the protection of persons whose money is invested by such companies"). The

Act requires all investment companies to register with the SEC, "with registration serving as the handle for the regulatory scheme." *Herpich v. Wallace*, 430 F.2d 792, 814 (5th Cir. 1970).

Section 12 of the ICA, which was adopted as part of the original statute in 1940, sets forth several detailed sections regulating the activities of investment companies. Included in this section is the anti-pyramiding provision, § 12(d)(1), which was designed "'to prevent a registered investment company from controlling other investment companies and creating complicated pyramid structures.'" *meVC Draper Fisher Jurvetson Fund I, Inc. v. Millennium Partners, L.P.*, 260 F. Supp. 2d 616, 620 (S.D.N.Y. 2003) (quoting S. Asia Portfolio, SEC No-Action Letter, 1997 SEC No-Act. LEXIS 419, *7 (Mar. 12, 1997)). The specific part of the anti-pyramiding section at issue in this case, § 12(d)(1)(A)(i), prohibits an investment company from obtaining more than three percent of the shares of another investment company.

In response to the enormous growth in the mutual fund market, Congress amended and strengthened the ICA in the Investment Company Amendments Act of 1970, Pub. L. No. 91-547, 84 Stat. 1413. This legislation created section 36(b), which expressly authorizes a security holder to bring a private right of action against an investment adviser to enforce the adviser's fiduciary duty "with respect to the receipt of compensation for services . . . ." 15 U.S.C. § 80a-35(b). Congress again amended the ICA with the Small Business Investment Incentive Act of 1980, Pub. L. No. 96-477, 94 Stat. 2275, which subjected business development companies to regulation under section 12. The legislative history of the 1980 Act contains a House of Representatives committee report, which states:

> The Committee wishes to make plain that it expects the courts to imply private rights of action under this legislation, where the plaintiff falls within the class of persons protected by the statutory provision in question. Such a right would be consistent with and further Congress' intent in enacting that provision, and where such actions would not improperly occupy an area traditionally the concern of state law. In appropriate instances, for example, breaches of fiduciary duty

>involving personal misconduct should be remedied under Section 36(a) of the [ICA]. With respect to business development companies, the Committee contemplates suits by shareholders as well as by the Commission, since these are the persons the provision is designed to protect, and such private rights of action will assist in carrying out the remedial purposes of Section 36.

H.R. 1341, 96th Cong., 2d Sess. 28-29 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4810-11.

## II.     Pre-*Sandoval* Cases Addressing Private Causes of Action under the ICA

Early cases that addressed whether private causes of action could be recognized under the ICA often looked to extra-textual sources to decipher congressional intent. Many courts emphasized the general policy objectives underlying the statute and sought guidance from the 1980 House committee report. In addition, some courts justified the implication of private causes of action on the basis that they could serve as efficacious means for enforcing the ICA's prohibitions. A large number of courts have utilized this liberal interpretive approach and have recognized implied private rights of action under various provisions of the ICA.[2] *See, e.g.*, *Meyer v. Oppenheimer Management Corp.*, 764 F.2d 76, 86-88 (2d Cir. 1985) (recognizing a private cause of action under § 15(f)); *Taussig v. Wellington Fund, Inc.*, 313 F.2d 472, 476 (3d Cir. 1963) (same as to § 35(d)); *Blatt v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 916 F. Supp. 1343, 1349 (D.N.J. 1996) (same as to §§ 7(d), 13(a)(3)); *Seidel v. Lee*, No. 93-494, 1994

---

[2] In *Fogel v. Chestnutt*, 668 F.2d 100, 112 (2d Cir. 1981), a representative decision from this early period, the Second Circuit recognized a private cause of action under the ICA, despite the fact that the issue had become "more debatable," in light of contemporary Supreme Court precedent that advanced a more restrictive approach to implying private causes of action for damages. *Id.* at 105 & 112 (citing, e.g., *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979)). The Second Circuit emphasized, in an opinion authored by Judge Friendly, that
>[i]n adopting a statute intended as a thorough and pervasive regulation of the investment company industry, in part because of the inadequacies of the 1933 and 1934 Acts to cope with the grave abuses and evils that had developed in some quarters of the investment company business, and in the face of the declaration in § 1, it seems to us highly unlikely that Congress intended that . . . enforcement should be solely the task of the SEC and of the criminal law, and that injured investors should have no recourse in a federal court.

*See Fogel*, 668 F.2d at 112 (internal citations and quotations omitted).

U.S. Dist. LEXIS 21534, at *8-9 (D. Del. Oct. 14, 1994) (same as to §§ 17(j), 36(a), 56(a), 57(a), 57(d)); *Krome v. Merrill Lynch & Co.*, 637 F. Supp. 910, 917-20, *vacated in part*, 110 F.R.D. 693 (S.D.N.Y. 1986) (same as to §§ 7(a), 10(b), 15, 17(a), 22, 34(a), 36).

Private causes of action have been recognized under the two provisions at issue in this case. In *Bancroft Convertible Fund, Inc. v. Zico Inv. Holdings, Inc.*, 825 F.2d 731, 736 (3d Cir. 1987), the Third Circuit found a private right of action for violations of § 12(d)(1)(A). Similarly, in *In re ML-Lee Acquisition Fund II, L.P.*, 848 F. Supp. 527, 539-45 (D. Del. 1994), the court found that an action existed under several provisions, including § 48, which prohibits any actions taken by a person "to cause" another person to do anything that "would be unlawful" under the ICA. *Id.* at 545. The courts in *Bancroft* and *In Re ML-Lee Acquisition Fund II* both cited the language in the 1980 House committee report as a persuasive authority in concluding that Congress intended for courts to imply private rights of action under the Act. *See Bancroft*, 825 F.2d at 735 (noting that the "[1980] amendment's legislative history . . . discloses congressional enthusiasm for private enforcement").

###    III.    Post-*Sandoval* Cases Addressing Private Causes of Action under the ICA

With its decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001), the Supreme Court marked a sea change in the law relating to judicially-implied private causes of action. In *Sandoval* the Court held that a private cause of action could not be brought to enforce the disparate-impact regulations issued under Title VI of the Civil Rights Act of 1964. *Id.* at 293. The Court noted that "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* at 286. In reviewing statutory language, courts must first determine whether it contains "rights-creating" language. Such explicit rights-creating language is evidenced in

statutory provisions that include phrases such as: "no person . . . shall . . . be subjected to discrimination." *Id.* at 289. If rights-containing language is present, a reviewing court must then inspect whether the statute's remedial schemes entrust government agencies or private parties with primary responsibility for statutory enforcement. *Id.* at 288-89. Finally, the Court emphasized that statutory intent is the determinative factor in the judicial inquiry, and that when such intent is not manifest, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute."[3] *Id.* at 287.

The Supreme Court's new approach to implied causes of action was applied to the Investment Company Act by the United States Court of Appeals for the Second Circuit in *Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429 (2d Cir. 2002). *Olmsted* concerned §§ 26(f) and 27(i), which Congress added to the ICA in 1996. The court relied heavily on *Sandoval*, and noted that the lack of any express rights-creating language in §§ 26(f) and 27(i), gave rise to a "strong presumption that Congress did not intend a private right of action," which correspondingly "places a heavy burden on the plaintiffs to demonstrate otherwise." *Id.* at 433. The plaintiff's case was further undermined by the fact that § 42 of the ICA empowers the SEC to enforce the statute's provisions and that Congress explicitly provided investors with a right to sue derivatively under § 36(b). *Id.* The court disregarded the House committee report accompanying the 1980 amendments to the ICA, because it did not constitute an "extraordinary showing" of congressional intent that would militate for a conclusion contrary to the

---

[3] In *Gonzaga University v. Doe*, 536 U.S. 273, 276 (2002) the Court reaffirmed its pronouncements in *Sandoval*, when it held that the Family Educational Rights and Privacy Act of 1974 ("FERPA"), 88 Stat. 571, 20 U.S.C. § 1232g, did not create personal rights that were enforceable under 42 U.S.C. § 1983. The Court noted that in order to give rise to individual rights, a statute's language must convey "an *unmistakable focus* on the benefited class." *Gonzaga*, 536 U.S. at 284 (emphasis in original) (internal quotation marks omitted).

unambiguous statutory text.  *Id.* at 435 (internal quotation marks omitted).  Finally, the Second Circuit distinguished the "long line of decisions recognizing implied private rights of action as a way of promoting the policies served by the ICA."  *Id.* at 433-34.  The court noted that they predated the Supreme Court's new, more restrictive analysis set forth in *Sandoval*, and that "[p]ast decisions reflecting judicial willingness to 'make effective [statutory] purpose' in the context of implied rights of action belong to an '*ancien regime*.'"  *Id.* at 434 (quoting *Sandoval*, 532 U.S. at 287 (emphasis in original)).

The *Sandoval* framework for considering private rights of action, as applied to the ICA in *Olmsted*, has been previously sanctioned by this Court.  In determining that no private right of action existed under §§ 34(b) and 36(a) of the ICA, Judge Motz remarked:

> The text of a statute is the focus of the inquiry under the *regime actuel*, and such extraneous factors as isolated bits of legislative history, the "expectations that the enacting Congress had formed in light of the contemporary legal context," and interpretations given by one Congress to the enactments of another, no longer carry the day.

*In re Mutual Funds Investment Litig.*, 384 F. Supp. 2d 845, 870 (D. Md. 2005) ("*Mut. Funds I*") (quoting *Sandoval*, 532 U.S. at 287-88).  In a companion case, Judge Blake dismissed claims brought under § 48(a), and noted that "numerous district courts have recently found that § 48(a) does not create a private right of action."  *In re Mutual Funds Investment Litig.*, 437 F. Supp. 2d 449, 451 n.3 (D. Md. 2006) ("*Mut. Funds II*").

These previous rulings of this Court are part and parcel of a large and growing body of case law denying private causes of action under various provisions of the ICA.  *See, e.g.*, *Korland v. Capital Research & Mgmt Co.*, No. CV-08-4020, 2009 U.S. Dist. LEXIS 33937 at *12-13 (C.D. Cal. Feb. 10, 2009) (finding no private cause of action under § 48(a)); *In re Morgan Stanley and Van Kampen Mut. Fund Sec. Litig.*, 03 Civ. 8208, 2006 U.S. Dist. LEXIS

20758, at *43-44 (S.D.N.Y. Apr. 18, 2006) (same as to §§ 34(b) and 48(a)); *In re Blackrock Mut. Funds Fee Litig.*, 04 Civ. 164, 2006 U.S. Dist. LEXIS 13846, at *14-20 (W.D. Pa. Mar. 29, 2006) (same as to §§ 34(b), 36(a), and 48(a)); *In re Dreyfus Mut. Funds Fee Litig.*, 428 F. Supp. 2d 342, 347-49 (W.D. Pa. 2005) (same as to §§ 34(b) and 36(a)); *In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451, 465 (D.N.J. 2005) (same as to § 34(b)); *White, et al. v. Heartland High-Yield Mun. Bond Fund, et al.*, 237 F. Supp. 2d 982, 986-88 (E.D. Wis. 2002) (same as to §§ 22 and 34(b)).  An observer need only contrast the results of the pre-*Sandoval* opinions with the results of the post-*Sandoval* decisions to ascertain the tremendous impact of the Supreme Court's seminal precedent on the issue of judicially-implied private causes of action.

### IV.     Whether A Private Cause of Action May be Implied under Section 12(d)(1)(A) of the ICA

Only one post-*Sandoval* decision has addressed the precise issue before this court—specifically, whether a private cause of action may be implied under § 12(d)(1)(A).  In *meVC Draper Fisher Jurvetson Fund I, Inc. v. Millennium Partners, L.P.*, 260 F. Supp. 2d 616 (S.D.N.Y. 2003), the plaintiff, a closed-end fund, brought suit in the midst of a proxy fight to prevent the defendant investment companies from voting the shares they had acquired in the plaintiff's fund at an upcoming shareholder vote.  The court held that the fund lacked standing in the case because no private right of action could be implied under § 12(d)(1)(A).  In reaching this conclusion, the court adopted the factors addressed by the Second Circuit in *Olmsted*:

> First, § 12(d)(1)(A) does not provide an express private right of action, leading to a presumption that Congress did not intend one.  Second, § 12(d)(1)(A) does not contain any rights-creating language, but, like §§ 26(f) and 27(i)), begins with the phrase "It shall be unlawful …."  Third, § 42 authorizes the SEC to enforce § 12(d)(1)(A) just as it authorizes the SEC to enforce the rest of the ICA.  Finally, Congress's provision of an express private right of action in § 36(b) compels a negative inference in this case similar to the one it compelled in *Olmsted*.

*Millennium*, 260 F. Supp. 2d at 622.  Finally, the court followed *Olmsted*'s lead by refusing to rely upon the statements in the 1980 House committee report.  *Id.* at 625.

Plaintiff contends that in addressing this issue of first impression in the Fourth Circuit, this Court should not be hamstrung by the *Millennium* decision.  GGMT argues that the Southern District of New York reached the wrong conclusion in that case largely because it did not sufficiently analyze the statutory text of § 12(d)(1)(A).

This Court accepts the invitation to analyze whether a private right of action exists under § 12(d)(1)(A) afresh with special emphasis upon the statutory text.  Nevertheless, in reaching its decision, this Court is guided both by controlling precedent in *Sandoval*, and by the decisions in *Olmsted* and *Millennium*, due to their significant persuasive force.

Section 12(d)(1)(A) provides, in relevant part:

> (d)(1)(A)  It shall be unlawful for any registered investment company (the "acquiring company") and any company or companies controlled by such acquiring company to purchase or otherwise acquire any security issued by any other investment company (the "acquired company"), and for any investment company (the "acquiring company") and any company or companies controlled by such acquiring company to purchase or otherwise acquire any security issued by any registered investment company (the "acquired company"), if the acquiring company and any company or companies controlled by it immediately after such purchase or acquisition own in the aggregate—
> > (i) more than 3 per centum of the total outstanding voting stock of the acquired company;

15 U.S.C. § 80a-12(d)(1)(A).

Plaintiff argues that the protected party in § 12(d)(1)(A) is the registered investment company, or "acquired company," whose shares are being targeted for purchase by another investment company.  They contend that the language of the provision is rights-creating in that it focuses upon the acquired company.  GGMT submits that because they fall within the protected

class of the anti-pyramiding provision, they have standing to bring the instant lawsuit to thwart Defendants' takeover attempt.

However, Plaintiff's argument stumbles right out of the gate. The ICA does not protect investment companies; instead it was designed and implemented to protect individuals who invest in such companies. Section 1 of the Act provides, in relevant part:

> [I]t is hereby declared that the national public interest and the interest of investors are adversely affected—
> . . .
> (4) when the control of investment companies is unduly concentrated through pyramiding or inequitable methods of control, or is inequitably distributed, or when investment companies are managed by irresponsible persons;
> . . .
> It is hereby declared that the policy and purposes of this title, in accordance with which the provisions of this title shall be interpreted, are to mitigate and, so far as is feasible, to eliminate the conditions enumerated in this section which adversely affect the national public interest and the interest of investors."

15 U.S.C. § 80a-1(b). Thus, the statute explicitly states that its various subparts—including the anti-pyramiding provision—must be interpreted as benefitting and protecting the interests of investors.

GGMT's unique interpretation of § 12(d)(1)(A) is premised upon the tenuous assumption that an investment company would always resist another company's attempts to acquire a foothold stake in order to protect its investors. However, it is conceivable that mangers of an investment company could, under certain circumstances, invite investments from other companies, irregardless of whether such transactions could redound to the detriment of the acquired company's investors. It is notable that § 12(d)(1)(A) prevents all inter-fund investments (beyond certain enumerated percentage thresholds) and not merely hostile acquisitions; Congress apparently sought to prevent harm resulting under either situation. In addition, GGMT's interpretation assumes that managers of investment companies are immune

from conflicted behavior.  However, as noted above, the ICA is based upon the exactly the opposite assumption, as it was designed to protect investors from the conflicts of interest, self-dealing, and abusive practices of the self-interested investment companies, their managers, and their affiliates.  *See Reeves v. Continental Equities Corp.*, 912 F.2d 37, 41 (2d Cir. 1990) (noting that "the ICA was enacted for the benefit of *investors*, and not employees of investment companies") (emphasis in original); *Herpich v. Wallace*, 430 F.2d 792, 816 (5th Cir. 1970) (observing that "Congress intended to provide a comprehensive regulatory scheme to correct and prevent certain abusive practices in the management of investment companies for the protection of persons who put up money to be invested by such companies on their behalf").  GGMT, on the other hand, has provided no convincing reason why an investment company should be treated as a protected entity—rather than as a regulated entity—under the anti-pyramiding provision.

Having resolved that investment companies are not protected under the anti-pyramiding provision, GGMT does not have standing to bring the instant cause of action under § 12(d)(1)(A).  Nevertheless, in light of the heated nature of the proxy fight between the parties, and the possibility that GGMT investors could attempt to bring suit to bar Defendants' actions, this Court addresses the additional question of whether an investor has a right to bring a private cause of action under the anti-pyramiding provision.

This Court begins by analyzing the statutory text to see if it affords private rights to investors.  As an initial matter, the section begins with the phrase "It shall be unlawful . . .", evidencing the section's focus upon the person regulated.  *Millennium*, 260 F. Supp. 2d at 622 (citing *Sandoval*, 532 U.S. at 289; *Olmsted*, 283 F.3d at 432).  The rest of the language in the provision is directed solely at imposing regulations upon investment companies.  There is no corresponding focus upon the person protected by the provision; indeed, nowhere in §

12(d)(1)(A) is an investor or security holder mentioned.[4] Thus, because it is not "'phrased in terms of the persons benefited,'" *Gonzaga University v. Doe*, 536 U.S. 273, 284 (2002) (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 692, n.13 (1979)), the anti-pyramiding provision "'create[s] no implication of an intent to confer rights on a particular class of persons.'" *Olmsted*, 283 F.3d at 433 (quoting *Sandoval*, 532 U.S. at 289) (internal quotation marks omitted).

Additionally, this Court finds that the ICA's enforcement scheme does not evidence a congressional intent to create a private remedy under § 12(d)(1)(A). *See Gonzaga*, 536 U.S. at 284 ("a plaintiff suing under an implied right of action still must show that the statute manifests an intent 'to create not just a private *right* but also a private *remedy*'") (quoting *Sandoval*, 532 U.S. at 286) (emphasis in original). It is clear that no remedy is provided under § 12(d)(1)(A), as the provision merely prohibits pyramiding activities by investment companies. Moreover, the remedial mechanisms in other provisions of the ICA promotes the inference that § 12(d)(1)(A) was not intended to provide a private right of action. Under § 42, the SEC is alone authorized to enforce the ICA's provisions, including § 12(d)(1)(A). *Olmsted*, 283 F.3d at 433 ("'the express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others'") (quoting *Sandoval*, 532 U.S. at 289) (internal quotation marks omitted). In addition, § 36(b), which was incorporated by amendment in 1970, expressly authorizes investors to sue advisers for breach of fiduciary duties. 15 U.S.C. § 80a-35(b). No other express private right of action is provided in the statutory text. This Court is persuaded by the observation that "'Congress's explicit provision of a private right of action to enforce one section of a statute

---

[4] In *Sandoval*, the Court noted that the specific provision at issue, Section 602 of Title VI of the Civil Rights Act of 1964, did not focus on "the individuals who will ultimately benefit from Title VI's protection." 532 U.S. at 289. Likewise, in this case, § 12(d)(1)(A) does not focus upon the investors, despite the fact that they are the ultimate beneficiary of the ICA's prohibition.

suggests that omission of an explicit private right to enforce other sections was intentional.'" *Millennium*, 260 F. Supp. 2d at 622 (quoting *Olmsted*, 283 F.3d at 433).

As per the Supreme Court's directive in *Sandoval*, the private cause of action analysis starts and ends with a straightforward interpretation of unambiguous statutory text and structure. The foregoing analysis cements the formidable presumption that no private cause of action exists under § 12(d)(1)(A). On the other hand, GGMT has not presented any contravening argument that would weaken this presumption.

GGMT relies upon two cases that recognized a private cause of action under § 12(d)(1)(A). *See* Pl.'s Opp at 15 (citing *Clemente Global Growth Fund, Inc. v. Pickens*, 705 F. Supp. 958, 962-63 (S.D.N.Y. 1989); *Bancroft*, 825 F.2d at 733). Both of these decisions are from the discredited *ancien regime* that pre-dated the *Sandoval* decision. In addition, with respect to its holding regarding § 12(d)(1)(A), the *Clemente* decision has been undermined by *Olmsted* and *Millennium*. In *Clemente*, the court quoted the following statement from *Bancroft* with approval:

> [the acquiring company] makes no persuasive argument which suggests
> congressional intention to treat the prohibition against investment company
> pyramiding differently, for purposes of private enforcement, than are the various
> other prohibitions in the Act which are also intended to protect investors.

*Clemente*, 705 F. Supp. at 963 (quoting *Bancroft*, 825 F.2d at 733). This Court shares the view that the provision protects investors. However, just because a statute is found to protect a certain party does not mean that that party is automatically conferred a private cause of action under the statute. Post-*Sandoval*, a protected party has standing to bring a private cause of action only if the statutory provision in question contains rights-containing language that clearly exhibits congressional intent to endow the beneficiary with a private right and the statute provides a private remedy. As determined above, § 12(d)(1)(A) does not confer a private right and remedy

to aggrieved investors, who must therefore depend upon the SEC to enforce the prohibition against pyramiding activities.

The cases cited by GGMT also noted that "'[the] directors [of investment companies] are uniquely qualified to assert private causes of action in the interest of the security holders to whom they owe fiduciary obligations.'" *Clemente*, 705 F. Supp. at 963 (quoting *Bancroft*, 825 F.2d at 733). The anti-pyramiding prohibition might be more effectively enforced if it permitted investment company directors—as well as the SEC—to thwart takeover challenges.[5] Nevertheless, the Supreme Court has specifically cautioned against allowing such prudential factors to inform a court's statutory interpretation. *See Sandoval*, 532 U.S. at 286-87 (stating that "[s]tatutory intent . . . is determinative . . . [w]ithout it, a cause of action does not exist and courts may not create one, *no matter how desirable that might be as a policy matter, or how compatible with the statute*") (emphasis added).

Finally, GGMT gains no traction for its cause by referring to the 1980 House committee report, which was issued forty years after § 12(d)(1)(A) was promulgated. In *Sandoval*, the Supreme Court explicitly stated that judges should not attempt to divine the "expectations that the enacting Congress had formed in light of the contemporary legal context." *Sandoval*, 532 U.S. at 287. This interpretative method was deemed overly speculative and too far removed from the statutory text. *Id.* at 287-88. *See also Mut. Funds I*, 384 F. Supp. 2d at 870 ("interpretations given by one Congress to the enactments of another, no longer carry the day").

Having determined that § 12(d)(1)(A) does not provide investors with a private cause of action, this Court holds that GGMT lacks standing to bring its claim under this provision. As a result, GGMT also lacks standing to bring a claim for control person liability under § 48(a) of the

---

[5] However, as mentioned above, there is no reason to assume that mangers of investment companies would always seek to block acquiring companies in order to protect the best interests of their investors.

ICA, because such a claim must be predicated upon the violation of another provision of the ICA.  *See, e.g.*, *In re Franklin Mut. Finds Fee Litig.*, 388 F. Supp. 2d 677, 688 (D.N.J. 2007); *Mut. Funds I*, 384 F. Supp. 2d at 870, n.28.  In addition, this Court agrees with the conclusion reached in several other cases—that a plaintiff may not assert a private cause of action under § 48(a) of the ICA.  *See, e.g.*, *In re Eaton Vance Mut. Funds Fee Litig.,* 380 F. Supp. 2d 222, 231-33 (S.D.N.Y. 2005); *Boyce v. AIM Mgmt. Group, Inc.,* No. 04-2587, 2006 U.S. Dist. LEXIS 71062, at *16 (S.D. Tex. Sept. 29, 2006); *In re Blackrock Mut. Funds Fee Litig.*, No. 04-164, 2006 U.S. Dist. LEXIS 13846, at **14-20 (W.D. Pa. Mar. 29, 2006).

## CONCLUSION

For the reasons stated above, GGMT lacks standing to assert private causes of action under sections 12(d)(1)(A) and 48 of the Investment Company Act of 1940.  Accordingly, Defendants' Motion to Dismiss (Paper No. 6) is GRANTED.  A separate Order follows.


Date : April 1, 2010                                /s/_____
                                                    Richard D. Bennett
                                                    United States District Judge